IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

KELLY JEAN GRISHAM       )
                                )
        Plaintiff,        )
                                )
        v.           )   CASE NO. 1:12-cv-825-TFM
                                )   [wo]
CAROLYN W. COLVIN,      )
Acting Commissioner of Social Security,   )
                                )
        Defendant.     )

## MEMORANDUM OPINION AND ORDER

      Kelly Jean Grisham ("Plaintiff" or "Grisham") applied for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401 *et seq*., on August 14, 2009. Tr. 19. After being denied on November 2, 2009, Grisham timely filed for and received a hearing before an administrative law judge ("ALJ") who rendered an unfavorable decision on February 18, 2011. Tr. 19, 35. Grisham subsequently petitioned for review to the Appeals Council who rejected review of Grisham's case on August 2, 2012. Tr. 1. As a result, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner"). *Id.* Judicial review proceeds pursuant to 42 U.S.C. § 405(g), and 28 U.S.C. § 636(c). After careful scrutiny of the record and briefs, for reasons herein explained, the Court AFFIRMS the Commissioner's decision.

## I. NATURE OF THE CASE

      Grisham seeks judicial review of the Commissioner's decision denying her

application for disability insurance benefits. United States District Courts may conduct limited review of such decisions to determine whether they comply with applicable law and are supported by substantial evidence. 42 U.S.C. § 405. The court may affirm, reverse and remand with instructions, or reverse and render a judgment. *Id*.

## II. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is a limited one. The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied. *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)). Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Foote*, 67 F.3d at 1560 (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district

court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).   The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560 (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).   The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth*, 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   There is no presumption that the Commissioner's conclusions of law are valid. *Id*.; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

### III.  STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement,

provided they are both insured and disabled, regardless of indigence.[1]  *See* 42 U.S.C. § 423(a).  The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program.  SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.[2]  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled.  *Patterson v. Bowen*, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986).  Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are

---

[1] DIB is authorized by Title II of the Social Security Act, and is funded by Social Security taxes. *See* Social Security Administration, Social Security Handbook, § 136.1, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html
[2] SSI benefits are authorized by Title XVI of the Social Security Act and are funded by general tax revenues.  *See* Social Security Administration, Social Security Handbook, §§ 136.2, 2100, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004).  Claimants establish a prima facie case of qualifying disability once they meet the burden of proof from Step 1 through Step 4.  At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform.  *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

Residual Functional Capacity ("RFC").  *Id*. at 1238-39.  RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence.  *Id*.  It also can contain both exertional and nonexertional limitations.  *Id*. at 1242-43.  At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform.  *Id*. at 1239.  To do this, the ALJ can either use the Medical Vocational Guidelines[4] ("grids") or hear testimony from a vocational expert ("VE").  *Id*. at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience.  Each factor can independently limit the number of jobs realistically available to an individual.  *Id.* at 1240.  Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled."  *Id*.

## IV.  ADMINISTRATIVE FINDINGS AND CONCLUSIONS

Grisham, age 49 at the time of the hearing, has completed the 11th grade, and is able to read and write.  Tr. 160, 164, 171.  Grisham has past relevant work as a bartender (semi-skilled, light), receptionist (semi-skilled, sedentary), and insurance sales agent (skilled, light).  Tr. 33-34.  Grisham's alleged disability onset date is October 31, 2008.  Tr. 19.  Grisham has not engaged in substantial gainful work activity since the alleged onset date.  Tr. 21.  Grisham meets the insured status requirements of the Social Security Act through December 31, 2013.  *Id*.  Grisham claims she is unable to work because of

---

[4] *See* 20 C.F.R. pt. 404 subpt. P, app. 2; *see also* 20 C.F.R. § 416.969 (use of the grids in SSI cases).

carpal tunnel syndrome, back pain, Attention Deficit Hyperactivity Disorder ("ADHD"), interstitial cystitis, bronchitis/respiratory infections, and urinary tract infections. *See* Doc. 13 at 3-4. Grisham testified that, at the time of the hearing, she assisted an elderly couple by doing chores for them two days per week and is paid $50 per visit. Tr. 50-51.

Grisham received treatment from various medical practitioners and the ALJ considered the medical records from these practitioners.

## A.   Primary Care Physician

Beginning in 2006, David Rhyne, M.D. ("Dr. Rhyne") has served as Grisham's primary care physician. On October 10, 2006, Grisham saw Dr. Rhyne for the first time with complaints of "urinary symptoms with frequency and urgency" and headaches. Tr. 296. Dr. Rhyne's assessment was that Grisham's headaches appeared to be "tension, muscle-contraction" related, she had general fatigue, and her urinary problems were related to a urinary tract infection ("UTI"). *Id.* Grisham was prescribed an antibiotic, but returned to Dr. Rhyne's office on October 17, 2006 because the antibiotic made her sick. Tr. 295. Dr. Rhyne found that Grisham had "recent cystitis" and irritable bowl syndrome ("IBS"), but noted that "CBC today was totally normal with urinalysis showing very minimal pyuria." Grisham was given multiple temporary prescription medications, and did not return for four months. Tr. 294-95.

On February 28, 2007, Grisham returned to Dr. Rhyne's office because a screening test she had done at a health fair reported an abnormal bone density. Tr. 294. Dr. Rhyne noted that it was a vague screening test, and there was no injury. *Id.* Dr. Rhyne also noted that Grisham was "doing quite well," but wanted to schedule a bone mineral

density test to examine what he considered "questionable osteoporosis with abnormal screening exam." *Id.* On March 29, 2007, Grisham saw Dr. Rhyne with complaints of pain in her hand and wrist. Tr. 293. Dr. Rhyne diagnosed Grisham with right hand carpal tunnel syndrome, gave her a "cock-up wrist splint," told her to take two Advil pills after meals, and advised her that she may need surgery in the future. *Id.*

On July 31, 2007, Grisham returned to Dr. Rhyne's office with complaints of elevated blood pressure according to a home nurse, "GE reflux symptoms", and the same problems with "urinary frequency at night and nocturia x 3." Tr. 292. Grisham's blood pressure was noted as normal on the date of the visit, but she was told to continue to monitor it. *Id.* Dr. Rhyne also noted that Grisham had discontinued all medications he previously prescribed "several weeks ago." *Id.* Dr. Rhyne prescribed Zegerid for three weeks to treat Grisham's symptoms of gastroesophageal reflux disease ("GERD"), and referred her to the urologist regarding her nocturia x 3. *Id.*

On December 27, 2007, Grisham sought treatment for pain in her neck from carrying babies in her right arm for an extended period of time. Tr. 291. Dr. Rhyne found dorsal thoracic kyphosis (over-curvature of the spine) present possibly caused by degenerative disc disease, tender cervical fat pad, painful posteriority; however, he found no real radiculopathy, good reflexes in both extremities, and Grisham's x-rays were normal. *Id.* Dr. Rhyne prescribed a temporary medication regimen. *Id.* Grisham returned on January 3, 2008 with similar complaints of neck pain, but this stated her belief that she overdid it putting up her Christmas decorations. Tr. 289. Gary G. Allen,

M.D.[5] ("Dr. Allen") saw Grisham on this particular visit.  Tr. 288.  Dr. Allen noted that Grisham does not have "any true radiculopathy-type symptoms," her C-spine x-rays are negative, she has 5/5 strength in upper extremeties, and she has full flexion and extension, but with pain at the extremes of motion in lateral rotation and lateral bending.  Tr. 289.  Dr. Allen's impression was neck spasms, and assigned exercises and physical therapy.  *Id.*  On January 18, 2008, Grisham returned to Dr. Rhyne's office requesting pain medication for pain in her knees and shoulders; however, Dr. Allen noted that she was already given Lortab and stated that he "refused to give her any form of pain medication."  Tr. 288.  Dr. Allen suggested that Grisham should go to the emergency room ("ER") for evaluation and observation if the pain was intolerable.  *Id.*

On January 25, 2008, Grisham saw Dr. Rhyne again complaining of increased problems with her neck, shoulders, and knees, and she also stated that the ordered physical therapy did not improve her condition.  Tr. 287.  Dr. Rhyne noted that Grisham did go to the ER, where she received a trigger injection in her neck and was prescribed Darvocet and Naprosyn, but nothing for her knees.  *Id.*  Dr. Rhyne found a "large cervical fat pad with definite tenderness by palpation posteriorly on the neck and upper T-spine region," but noted that Grisham's range of motion was fair.  *Id.*  Dr. Rhyne also found some early degenerative joint disease changes to her knees, but found no crepitance and only mild ligament laxity evident.  *Id.*  Grisham was given four Depo Medrol injections, her pain medication was increased, and she was instructed to use moist heat and utilize a small pillow for relief.  *Id.*

---

[5] Dr. Allen is located within the same office as Dr. Rhyne.

On April 21, 2008, Grisham returned with complaints of pain in her shoulder and wrist (primarily in her wrist), as well as recent swelling in her feet and hands.  Tr. 286. Dr. Rhyne found mild pedal edema and right wrist inflammatory arthritis.  *Id.*  Dr. Rhyne gave Grisham another Depo Medrol injection, recommended moist heat again, and scheduled tests to check her kidney functioning.  *Id.*  Grisham returned on June 16, 2008 with complaints of a cough and loss of voice, along with a fever, chills, nausea, and vomiting.   Shane Cunningham, D.O.[6] ("Dr. Cunningham") noted that Grisham has a history of tobacco abuse, she was not experiencing wheezing or shortness of breath, and found that it was probably bronchitis.  *Id.*  Dr. Cunningham gave Grisham another Depo Medrol injection, advised her to stop smoking, and prescribed Z-Pak, Tussionex, and Phenergan.  *Id.*  Grisham called Dr. Rhyne's office on June 17, 2008, and said she had "spilled her bottle of Tussionex."  Tr. 285.  Dr. Cunningham "[r]eluctantly" gave her another two ounces.  *Id.*  On September 5, 2008, Grisham saw Dr. Rhyne with complaints of right shoulder pain that radiates down her right arm.  Tr. 281.  Grisham stated there was no event that caused the pain, but she "does a lot of lifting and working."  *Id.*  Dr. Rhyne's assessment was that Grisham has "[c]ervical myositis plus/minus cervical osteoarthritis," and he advised her to apply moist heat and bio-freeze cream.  *Id.*

On October 21, 2008, Grisham's alleged onset date, she returned to Dr. Rhyne's office with complaints of persistent diarrhea lasting three weeks with associated anemia. Tr. 280.  Dr. Rhyne noted that there was "no [abdominal] tenderness whatsoever," and the physical exam on Grisham's extremities was negative.  *Id.*  Dr. Rhyne's diagnosis was

---

[6] Dr. Cunningham is located within the same office as Dr. Rhyne.

persistent diarrhea, and he prescribed Flagyl and Colestid to resolve the issues. *Id.* Grisham returned on October 31, 2008 with similar complaint of "having some diarrhea still;" however, "at times gets constipated." Tr. 279. Dr. Rhyne found that Grisham suffers from "intermittent diarrhea, persistent," and intermittent cystitis. *Id.* He prescribed Ferrous Sulfate, and referred Grisham to a gastroenterologist. *Id.*

On November 6, 2008, Dr. Rhyne performed a colonoscopy on Grisham which revealed only "[m]ild mucosal erythema throughout the colon." Tr. 243. On December 23, 2008, Grisham returned again with complaints of diarrhea that has had minimal improvement. Tr. 278. Dr. Rhyne noted that a biopsy showed lymphocytic and possible inflammation, and his diagnosis was lymphocytic colitis. *Id.* Dr. Rhyne prescribed Lomotil, and instructed Grisham to avoid milk products. *Id.*

On January 23, 2009, Grisham returned to Dr. Rhyne's office with complaints of left leg and knee pain resulting from and injury she suffered the previous day. Tr. 277. Grisham stated that she was pulling a wheelbarrow filled with logs that flipped on her and the handle hit her leg and twisted her knee. *Id.* Dr. Rhyne found that Grisham had good range of motion in her hip and knee, no real bruising seen, and "neurovascular intact in the left leg," but he did find "some pain along the lateral aspect." *Id.* Dr Rhyne's assessment was a "left leg contusion and wrenching of the left knee," and he prescribed Skelaxin and Indocin and instructed Grisham to return if there is no improvement. *Id.*

On February 25, 2009, Grisham returned to Dr. Rhyne's office with complaints of right shoulder pain, swelling and pain in her hands, and occasional burning from her elbows to her fingertips. Tr. 276. Dr. Rhyne noted that Grisham "has what appears to be

reflex sympathetic dystrophy." *Id.* Dr. Rhyne found "no radicular pain from her neck present," good pulses in her hands. Capillary refill was good in both hands, and there was minimal swelling in her hands, and gave Grisham a trigger point injection of Depo Medrol. *Id.*

Between March and August of 2009, Grisham sought treatment on four occasions related to a cough, chest congestion, and shortness of breath. On March 30, 2009, Dr. Rhyne diagnosed Grisham as having acute bronchitis with rhinitis and some epistaxis, and prescribed medication. Tr. 275. On April 21, 2009, Dr. Rhyne saw Grisham after she previously sought treatment in the ER and was told that she had pneumonia; however, at a subsequent visit to Enterprise Hospital she was told she did not have pneumonia. Tr. 241-43, 275. Dr. Rhyne reviewed x-rays and found no evidence of pneumonia, and believes it was "dyspnea with exertion" and "possibly" has some left ventricular dysfunction." *Id.* Dr. Rhyne ordered an echocardiogram and a thalium GXT stress test. *Id.* On August 7, 2009, Grisham had complaints of a cough, chest congestion, and abdominal cramps after being treated in the ER the previous day. Tr. 234-38, 271. Dr. Rhyne stated that the abdominal cramps are likely due to her recently switching depression medications and he instructed Grisham to switch back. Tr. 271. Dr. Rhyne found rhinitis present and diagnosed Grisham with acute bronchitis, and prescribed her multiple medications. *Id.* Grisham returned on August 10, 2009 because her bronchitis had not been improving. Tr. 272. Dr. Rhyne gave Grisham a refill of the medications he prescribed on the previous visit. *Id.*

Between October of 2009 and February of 2010, Grisham saw Dr. Rhyne for four

unrelated issues.  On October 1, 2009, Grisham saw Dr. Rhyne due to mild hoarseness that began two weeks prior and was improving.  Tr. 408.  Grisham returned on October 8, 2009 due to abdomen pain and gastric bloating.  Tr. 404.  Dr. Rhyne scheduled a gastroenterology consultation later that day and told Grisham to start a low fat and bland diet.  Tr. 406.  Grisham returned on November 16, 2009 with complaints of bilateral lower back pain that radiates into both legs.  Tr. 401.  Dr. Rhyne scheduled Grisham for a CT Scan and a physical therapy consultation, as well as prescribed Flexeril and Zipsor.  Tr. 403.  On January 27, 2010, Grisham saw Dr. Rhyne with complaints of moderate pain in her right middle finger.  Tr. 397.  Dr. Rhyne found that Grisham has trigger finger pain and benign neoplasm of her skin, and conducted a punch biopsy, gave her a trigger point injection, and prescribed Lortab.  Tr. 400.  Finally, on February 4, 2010, Grisham saw Dr. Rhyne with complaints of sinus congestion that Dr. Rhyne found to be maxillary sinusitis and prescribed multiple medications to help alleviate her problems.  Tr. 393-95.

## B.    Specialists

On September 26, 2008, Grisham began receiving treatment at the Urological Associates of Dothan under the care of Rube R. Hundley, M.D. ("Dr. Hundley").  Tr. 341.  Dr. Hundley noted that he does not think Grisham has interstitial cystitis, and that her urine test came back negative.  *Id.*  Grisham returned on November 14, 2008 with complaints of persistent pain in her bladder, which Dr. Hundley believes she may now have interstitial cystitis.  Tr. 339.  Dr. Hundley scheduled Grisham for several procedures that were completed on November 21, 2008.  Tr. 338-39.  Grisham returned in December of 2008 and June of 2009 to discuss and change her medications for IBS and interstitial

cystitis.  Tr. 336-37.

On November 20, 2008, Grisham saw Robert P. Albares, M.D. ("Dr. Albares") upon referral by Dr. Rhyne for a gastroenterology consultation for her diarrhea, GERD, and interstitial cystitis.  Tr. 326.  Dr. Albares went over the results of her recent colonoscopy completed by Dr. Rhyne, and advised her that she was showing signs of "some colitis."  *Id.*  Dr. Albares adjusted Grisham's current medications and scheduled a follow up in two months.  *Id.*  Grisham did not return until October 13, 2009.  Tr. 347.  Grisham returned for a consultation regarding abdominal pain in addition to the previous symptoms from November.  *Id.*  Daniel F. Jackson, III, M.D. ("Dr. Jackson") recommended that Grisham undergo a stool study, a CT Scan of the abdomen and pelvis, and another colonoscopy.  *Id.*  The CT scan revealed no acute abnormality.  Tr. 439.  The scan of Grisham's liver, spleen, pancreas, and adrenals were unremarkable, except for a "few, tiny, hyperdense lesions [. . .] within the kidney, which are too small to characterize and most likely represent renal cortical cysts."  *Id.*  The CT scan also revealed no bowel obstruction or pneumoperitoneum.  *Id.*  Similarly, Grisham's October 27, 2009 colonoscopy revealed normal findings, with the exception of mild internal hemorrhoids.  Tr. 435.

On May 21, 2009, Grisham saw Alan D. Prince, M.D. ("Dr. Prince") after being referred by Dr. Rhyne for a neurological consultation.  Tr. 253.  Dr. Prince reviewed Grisham's complaints of pain in her arms and wrists, and numbness in her fingers.  *Id.*  Dr. Prince noted her mental status as "normal to all parameters", her cranial nerves as unremarkable, and her motor exam revealed "some weakness in both abductor pollicis

brevis muscles with a positive Tinel sign at both wrists." *Id.*  Dr. Prince diagnosed Grisham with Bilateral Carpel Tunnel Syndrome, and referred her for possible surgery. Tr. 254.

On June 5, 2009, Grisham underwent a right carpal tunnel release and a PIP joint cyst excision on her right small finger.  Tr. 263.  Orvis H. Chitwood, III, M.D. ("Dr. Chitwood") noted that there were no immediate complications.  *Id.*  On June 18, 2009, Grisham underwent left carpal tunnel release surgery with Dr. Chitwood after he found that conservative treatment for carpal tunnel had failed.  Tr. 262.  Dr. Chitwood noted that there were no immediate complications.  *Id.*  On June 30, 2009, Grisham returned for a follow up, and Dr. Chitwood found the wound to be healed.  Tr. 267.

On August 11, 2009, Grisham saw another urologist in Dr. Hundley's office[7] with complaints of urinary urgency, frequency, and diminished force of stream for the past five days.  Tr. 335.  The urologist noted that her bladder biopsies from November of 2008 were negative for malignancy, and Grisham reported improved symptoms after therapy. *Id.*  The urologist found that Grisham is taking multiple medications with anticholinergic properties, and advised her to stop taking Oxybutynin for now.  *Id.*  The urologist also found that the antihistamine Grisham was taking for a cold and her antidepressant medication "may have combined to put her into urinary retention."  *Id.*  The urologist taught Grisham how to self-catheterize as "a temporary necessity."  *Id.*  Grisham returned on August 14, 2009, due to pain and a burning feeling in her buttocks.  Tr. 334  Dr. Hundley discussed the only medications that he wanted Grisham to be taking, and

[7] The medical records only identify one of the urologist who saw Grisham by the initials BFW, the Court will refer to this doctor as "the urologist."  Tr. 335.

instructed her to self-catheterize later that day.  *Id.*

On September 11, 2009, Grisham returned with complaints of pelvic burning and pain.  Tr. 333.  The urologist noted that Grisham "is no longer self catheterizing" and that "[s]he feels she is emptying her bladder well," but she "just cannot tolerate the constant burning that she feels in her bladder area."  *Id.*  The urologist found no blood or signs of infection in Grisham's urine.  *Id.*  The urologist decided to try an intravesicle instillation, and stated that if she does not get relief from this, then they will consider doing another hydrodistention just like they did in November of 2008.  *Id.*  The urologist also advised Grisham to continue taking the Elmiron that Dr. Hundley prescribed in August because it often takes up to three months to see any significant symptomatic improvement.  *Id.*  On September 17, 2009, Grisham underwent the hydrodistention procedure because she had not gotten any relief since her appointment the previous week.  Tr. 332.  The urologist noted a successful procedure, and that Grisham was voiding on her own prior to discharge.  *Id.*

Grisham returned for a follow up with the urologist on October 21, 2009.  Tr. 540.  Grisham said that she was emptying her bladder appropriately at that time, and the urologist noted that they "briefly [had] her on self catheterization while she was on many medications with anticholinergic affects during an upper respiratory tract infection."  *Id.*  The urologist told Grisham to quit smoking and went over the positive effects it would have on her urinary bladder and her bowels.  *Id.*  On December 14, 2009, Grisham saw the urologist again after having a GI evaluation and was told that she has diverticulosis and was prescribed Hyoscyamine.  Tr. 539.  Grisham stated the new medication has

helped her diarrhea, calmed her bladder, and she has less urgency and frequency problems, but her dysuria persists. *Id.* Grisham underwent another intravesical instillation, and the urologist instructed her to stop taking Utira-C because of anticholinergic properties in combination with another medication is likely the cause of her retention issues. *Id.* The urologist again noted the one time they had her self-catheterize due to the multiple medications that she took with anticholinergic properties; however, they did not recommend self-catheterization again. *Id.*

On December 9, 2009, Grisham returned to Dr. Jackson with complaints of abdominal pain, diarrhea, and concerns regarding medication side effects. Tr. 419. Dr. Jackson noted that her recent colonoscopy and stool studies all came back negative, and her recent symptoms are likely caused by IBS. Tr. 420. Dr. Jackson also went over Grisham's medication side effects, and told her to lower her dose if they cause constipation. *Id.* Grisham returned on February 16, 2010 again suffering from abdominal pain. Tr. 416. Dr. Jackson noted that Grisham has never had a Esophagogastroduodenoscopy ("EGD"), discussed the risks of the procedure, and received her informed consent. On March 11 2010, Grisham underwent an Upper GI endoscopy to examine her epigastric abdominal pain. Tr. 415. Upon completing the procedure Dr. Jackson found Grisham's stomach and duodenum to be normal. *Id.* Dr. Jackson recommended an antireflux regimen, and prescribed prilosec.

From January to May of 2010, Grisham began seeing Mark Byard, M.D. ("Dr. Byard") at Wiregrass Urology. Tr. 604-16. On January 26, 2010, Grisham saw Dr. Byard for a second opinion. Tr. 615. Dr. Byard noted that Grisham had a high post void

residual, but no sign of a UTI.  *Id.*   On February 16, 2010, Grisham returned with complaints of pain, cramping, and burning.  Tr. 609.  Dr. Byard found that Grisham has a neurogenic bladder condition and still has a high post void residual, and prescribed medication.  Tr. 612.  On February 26, 2010, Dr. Byard performed a cystoscopy to drain Grisham's bladder and removed bladder stones.  Tr. 557.  On March 11, 2010, Grisham returned for a followup after her cystoscopy.  Tr. 608.  On May 5, 2010, Grisham returned stating that she feels she may not be emptying her bladder very well.  Tr. 605.  Grisham told Dr. Byard that she has had to self-catheterize "once."  *Id.*   Grisham was prescribed medication.  *Id.*

In August of 2010, Grisham returned to Dr. Chitwood due to her right middle and ring fingers becoming progressively more painful.  Tr. 619.  After deciding that conservative treatment has failed, Dr. Chitwood performed a second successful trigger finger operation on both middle and ring fingers.  Tr. 618-19.

## C.   **Mental Health**

On July 21, 2009, Grisham saw Dr. Rhyne because she felt depressed due to her son moving away from home.  Tr. 273.  Dr. Rhyne noted that Grisham has been on Prozac without response, and she is very anxious.  Dr. Rhyne diagnosed Grisham with situational depression and generalized anxiety disorder.  *Id.*   Dr. Rhyne noted that Grisham denied suicidal ideations, and told her to discontinue taking Prozac in favor of Pristiq.  *Id.*   During Grisham's August 7, 2009 visit, Dr. Rhyne noted that Grisham stopped taking Pristiq and started taking Prozac again, and he recommended that she switch back.  *Id.*

On October 21, 2009, Grisham saw Randy Jordan, Psy.D. ("Dr. Jordan") for a mental examination. Tr. 370. Grisham had an overall normal examination with nearly no difficulties reported. *Id.* Dr. Jordan stated that Grisham had more difficulties with severe depression in the 1990's, but did find that Grisham has "Major Depressive Disorder, recurrent, mild." Tr. 371. Dr. Jordan noted that Grisham's intellectual and psychiatric functions do not interfere with her daily living skills, but are "somewhat compromised by [her] physical function." *Id.* Dr. Jordan found that Grisham can manage her own finances, function independently, hear and understand normal conversation without great difficulty, carry out and remember instructions of a simple, one-step nature, do multi-step tasks without some degree of supervision, and respond well to coworkers, supervision, and everyday work pressures. Tr. 372. However, Dr. Jordan did find that continued psychiatric and medical care is needed. *Id.*

On February 11, 2010, Grisham saw Charles R. Hicks, M.D. ("Dr. Hicks") based on the referral of Dr. Jordan. Tr. 514. Grisham stated that she has been depressed over the past month and has had behavioral problems in the past such as anger and lack of impulse control. *Id.* She stated that her son moved to California and she misses him and is increasingly sad, blue, and depressed; however, she takes Pristiq which helps with her depressive symptoms. *Id.* She also stated her concern that Dr. Jordan told her that she may have adult ADHD. *Id.* After a mental examination, Dr. Hicks impression is that Grisham suffers from an adjustment disorder with depressed mood, major depression with melancholia, phase of life problems, and he ruled out adult ADHD. *Id.*

On October 27, 2010, Grisham saw Joanna Koulianos, Ph.D. (Dr. Koulianos") for

a Mental RFC Assessment.  Tr. 388.  Dr. Koulianos found that Grisham was moderately limited in her ability "to carry out detailed instructions," "to maintain attention and concentration for extended periods," "to interact appropriately with the general public," and "to respond appropriately to changes in the work setting."  Tr. 388-89.  Dr. Koulianos found that Grisham was not significantly limited in all other categories.  *Id.*  Dr. Koulianos' assessment is that Grisham is able to understand, remember, and carry out very short and simple instructions; can be in contact with the general public on an infrequent basis; and can handle no more than minimal changes in her work duties.  Tr. 390.

After review of the medical records, the ALJ found the following severe functionally limiting medical impairments: "interstitial cystitis, bilateral carpel tunnel syndrome, [IBS], diverticulitis, [GERD], recurrent asthmatic bronchitis, and mild depressive disorder.  Tr. 22.  The ALJ found that Grisham "has the residual functional capacity to perform many of the elements of light work," with the exception of several limitations.  Tr. 26.  The ALJ found that Grisham is unable to perform any past relevant work.  Tr. 33.  The ALJ then found that considering Grisham's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform."  Tr. 34.

## V.  ISSUES

Grisham raises two issues for judicial review:

(1) Whether the ALJ failed to provide adequate weight to the opinions of the claimant's treating physician; and

(2) Whether the jobs that the VE testified that the claimant can perform conflict with the Dictionary of Occupational Titles ("DOT").

*See* Doc. 13 at 6.

## VI.   Discussion

**A.   The ALJ properly discounted the opinion of Grisham's treating physician because it is inconsistent with his own treatment records, treatment records of specialists, objective medical evidence, and longitudinal medical evidence.**

Grisham argues that the ALJ erred by failing to provide adequate weight to the opinions of her treating physician.  *See* Doc. 13 at 7.  Specifically, Grisham argues that the ALJ erred in assigning "little weight" to her treating physician, Dr. Rhyne.  *Id.* Grisham asserts that Dr. Rhyne's "record is replete with numerous visits Ms. Grisham made to Dr. Rhyne with complaints of pain."  *See* Doc. 13 at 10.  Grisham also argues that Dr. Rhyne's specialty is listed as internal medicine, and treated Grisham for "impairments such as low back pain, [COPD], inflammatory arthritis and degenerative joint disease" which are within his area of expertise.  *Id.*  Finally, Grisham argues that the longitudinal record shows that Grisham has "sought treatment for carpal tunnel, low back pain, abdominal pain, [IBS], and trigger finger pain, all of which could reasonably be expected to cause significant pain.  *See* Doc. 13 at 10-11

The law in this Circuit is well-settled that the ALJ must accord "substantial weight" or "considerable weight" to the opinion, diagnosis, and medical evidence of the claimant's treating physician unless good cause exists not to do so.  *Jones v. Bowen*, 810 F. 2d 1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985).  The Commissioner, as reflected in his regulations, also demonstrates a similar

preference for the opinion of treating physicians:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalizations.

*Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 CFR §404.1527 (d)(2)). The ALJ's failure to give considerable weight to the treating physician's opinion is reversible error. *Broughton*, 776 F.2d at 961-62.

However, there are limited circumstances when the ALJ can disregard the treating physician's opinion. The requisite "good cause" for discounting a treating physician's opinion may exist where the opinion is not supported by the evidence, or where the evidence supports a contrary finding. *See Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987); *see also Phillips v. Barnhart,* 357 F.3d 1232, 1240–41 (11th Cir.2004). An ALJ can also discount the opinion of a medical source where it is inconsistent with the source's own notes. 20 C.F.R. § 404.1527(c)(3); *Phillips,* 357 F.3d at 1240–41. In weighing medical opinions, an ALJ need not explicitly address every factor so long as the ALJ provides good cause for rejecting the opinions. *Lawton v. Comm'r of Soc. Sec.*, 431 Fed. Appx. 830 (11th Cir. 2011). The ALJ must articulate the weight given to a treating physician's opinion and must articulate any reasons for discounting the opinion. *Schnorr*, 816 F.2d at 581.

The ALJ held:

None of the claimant's treating physicians have opined that the claimant has

> any particular restrictions on the basis of her impairments. On May 12, 2010, Dr. David Rhyne, a primary care physician, did opine that the claimant would have pain present to such an extent as to be distracting to the adequate performance of work activity (Exhibit 15F, page2). He also opined that physical activity such as walking, standing, bending, stooping, and moving of extremities would variably increase the claimant's pain to such a degree as to cause distraction from tasks or total abandonment of task (Exhibit 15F, page 2). He also opined that the claimant's prescribed medication would cause side effects that could be expected to be severe and limit effectiveness due to distraction in attention and drowsiness (Exhibit 15F, page 2). The opinion of Dr. Rhyne was given little weight for multiple reasons.

Tr. 31. The ALJ gave Dr. Rhyne's opinion little weight because he found it to be inconsistent with his treatment records; based, in part, outside of his area of expertise; not supported by the longitudinal medical evidence; and with heavy reliance on Grisham's subjective report of symptoms that are contrary to objective medical evidence. Tr. 31-32.

First, the ALJ found Dr. Rhyne's opinions inconsistent with his own treatment record. Tr. 31. The ALJ found that despite Dr. Rhyne's opinion that Grisham would have severe side effects from the medications that she is taking, Grisham never complained about side effects, nor do Dr. Rhyne's treatment records indicate that he has discussed side effects with Grisham. *Id.* The ALJ also found that although Dr. Rhyne said Grisham would be experiencing a large amount of pain, he did not give any work restrictions or refer Grisham to a pain management specialist.[8] Finally, the ALJ found that although Grisham visited Dr. Rhyne for a long period of time, "her visits were sporadic and consistently related to different, often minor temporary ailments." *Id.* The ALJ noted that Grisham's visits would range from skin lesion, bladder infection,

---

[8] The Court notes that Dr. Rhyne has referred Grisham to several specialists throughout his treatment history, and Grisham sought treatment from each of the specialists without reservation.

stomachache, or back pain with no consistent and repeated complaints of "pain caused constantly by any particular impairment, and Dr. Rhyne never emphasized that she had ay particular chronic condition that would cause her extensive pain." *Id.*

Next, the ALJ found Dr. Rhyne's opinion rested, in part, on an assessment of impairments outside of his area of expertise. *Id.* In addition to Dr. Rhyne, Grisham also sought treatment from specialists for each of her impairments. For example, Grisham saw a gastroenterologist for her IBS, a urologist for her interstitial cystitis, a bone and joint specialist for her carpal tunnel, and mental health specialists for her depression and anxiety. The ALJ noted that Grisham's urologist "did not opine that her interstitial cystitis would cause her much pain, and he did not give [Grisham] any work related restrictions." *Id.* Similarly, Grisham's gastroenterologist "did not opine that her [IBS] would cause her much pain, and he did not give [Grisham] any work related restrictions." *Id.* The ALJ ultimately held that "[i]n the absense of such opinions of the claimant's treating specialists, it is very difficult to assign much weight to an apparent extreme opinion offered by a treating general care physician. Tr. 32.

Additionally, the ALJ found that Dr. Rhyne often heavily relied on Grisham's "subjective report of symptoms and limitations, when the objective evidence did not support her symptoms." *Id.* The ALJ cites to a October 25, 2010 visit which an x-ray of Grisham's lumbar spine showed no evidence of fracture, dislocation, or arthritis; her intervertebral spaces, apophyseal, and sacroiliac joints were well preserved; and he soft tissue structure around the spine was normal. *Id.* "Despite the negative objective evidence, Dr. Rhyne diagnosed the claimant with back pain and ordered her to have a

trigger point injection." *Id.* The ALJ found Dr. Rhyne's periodic reliance on Grisham's subjective complaints over "an obvious lack of objective medical evidence" to be "troubling." *Id.*

Finally, the ALJ found that Dr. Rhyne's opinion "is not supported by the longitudinal medical evidence, including the treatment records of the claimant's specialists." *Id.* The ALJ found that the record does show intermittent flare-ups of Grisham's impairments; however, the record does not support the extreme pain that Dr. Rhyne alleges. *Id.* Since the ALJ recognized that Grisham does suffer from intermittent flare-ups, he sets forth several physical restrictions in his RFC assessment "which provide[] additional protection during a particular flare-up of one of the claimant's conditions. *Id.*

Grisham argues that the ALJ erred by discounting her treating physician because his "opinion seems to rest at least in part on an assessment of an impairment outside his area of expertise," and his "opinion is not supported by the longitudinal medical evidence." Tr. 31-32; *see also* Doc. 13 at 10-11. An ALJ may, by showing good cause, give minimal weight to a treating physician's opinion that a claimant is disabled when that opinion is "inconsistent with other evidence in the record." *Fries v. Comm'r of Soc. Sec. Admin.*, 196 Fed. Appx. 827, 833 (11th Cir. 2006). With regard to the ALJ finding that Dr. Rhyne's opinions are inconsistent with the medical records of Grisham's specialists, courts have held that "[m]ore weight is given 'to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.'" *King v. Barnhart*, 320 F. Supp. 2d 1227, 1231-32 (N.D. Ala.

2004) (quoting 20 C.F.R. § 404.1527(d)(5)).  Here, in addition to treating Grisham, Dr. Rhyne referred her to several specialists regarding her impairments.  Grisham sought treatment from each specialist on several occasions; in fact many of Grisham's appointments with specialists were either immediately following or immediately preceding an appointment with Dr. Rhyne with similar complaints.

In addition to the examples given by the ALJ, the Court also finds several more instances where Grisham's specialists' opinions were not as severe as Dr. Rhyne's opinion.  Dr. Chitwood performed two successful right carpal tunnel release surgeries and one successful left carpal tunnel release surgery.   In follow up appointments, Dr. Chitwood noted that there were no complications, that Grisham's wounds healed, that they had discussed physical therapy, and that Grisham was instructed to return if the symptoms do not improve.  Dr. Chitwood did not put any restrictions on Grisham after the follow ups, and Grisham never returned to report any complications.   Although Grisham has had regular flare-ups of her interstitial cystitis and IBS, the records regularly indicate negative testing and improved symptoms after treatment.  For example, Grisham had two colonoscopies; one revealing "some colitis" but was otherwise normal and the other revealing normal findings with the exception of mild internal hemorrhoids.  CT scans regularly revealed no abnormalities or bowel obstructions. Bladder biopsies were negative for malignancy.

On follow-up visits Grisham regularly reported improved symptoms after therapy or receiving medication, and when applicable her specialists would report that Grisham was voiding properly before she was discharged.  Many of Grisham's symptoms related

to her bladder retention were due to symptoms caused by a combined effect of medications prescribed.  Once her urologist resolved the medication issue, Grisham reported that the new medication regime helped her diarrhea, calmed her bladder, and she had less urgency and frequency problems.

These examples also support the ALJ's holding that Dr. Rhyne's opinion is not consistent with the longitudinal medical evidence.  The ALJ held that "[w]hile the record does document intermittent flare-ups of the claimant's impairments, it does not support such extreme pain experienced by the claimant." Tr. 32.  In addition to the examples above where Grisham would report substantial improvement after treatment, the record shows that Grisham would seek treatment often, however, not for the same symptoms. Grisham's medical records begin in October 2006 with urinary symptoms, but she did not return with similar complaints until July 2007 (about nine months later) despite being treated for other complaints during that time.  Grisham next complained of urinary symptoms in September 2008 (about a year and three month later), August through October 2009 (about eleven months later), and January through May 2010 (about three months later).

Similarly, Grisham began seeking treatment for Carpal Tunnel from May through June 2009, but after two surgeries did not return with complaints until August 2010 (about a year and two months later).  Grisham began seeking treatment for abdomen pain and diarrhea from October through December of 2008, but did not have further complaints until October 2009 (about ten months later), then again in December 2009 (about two months later), and March 2010 (three months later).  Finally, Grisham sought

treatment for neck and shoulder pain regularly from December 2007 through April 2008, but only returned one other time with further complaints of neck and shoulder pain in February 2009 (about eleven months later). Grisham also sought treatment for leg and knee pain, coughing and chest congestion, low back pain, and sinus congestion; however, she was only treated for each of these one time and did not return with further complaints.[9] Finally, Grisham only sought treatment from mental health specialists regarding depression and anxiety in July and October of 2009, and February of 2010 (each visit was about four months apart).[10]

The Court finds that the record provides substantial evidence for the ALJ's findings. Consequently, there is no error in the ALJ's determination that Dr. Rhyne's records were not consistent with those of Grisham's specialists or the longitudinal medical evidence, and the ALJ assigning little weight to Dr. Rhyne's opinion for these reasons.[11]

Grisham also argues that "it is error for the ALJ to dismiss the treating physician's opinion as to the claimant's RFC and disability status without specifically considering and discussing the factors listed in 20 C.F.R. § 404.1527(d)." *See* Doc. 13 at 11. Subsection (d) states:

(d) Medical source opinions on issues reserved to the Commissioner.

---

[9] Grisham's complaints of back, neck, leg and knee pain all came as a result of injuries sustained from physical activities.

[10] See the above Administrative Findings and Conclusions for an in depth outline of Grisham's medical history.

[11] The Court notes that the ALJ also assigned little weight to Dr. Rhyne's opinion because it was inconsistent with his own treatment records, and due to reliance on Grisham's subjective complaints when objective evidence did not support her claims; however, Grisham did not dispute these findings in her brief. Therefore, the Court will not discuss them in detail, but it does find that the record provides substantial evidence to support these findings as well.

Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

> (1) Opinions that you are disabled. We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

> (2) Other opinions on issues reserved to the Commissioner. We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§ 404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

> (3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section.

20 C.F.R. § 404.1527(d).  Subsection (d) provides nothing more than a general overview discussing which issues are reserved to the Commissioner.  The Court is unable to flesh out any "factors" that the ALJ would be required to discuss.  Additionally, Grisham has failed to cite to a single factor or make any argument as to how the ALJ failed to properly address the alleged factors.  It is clear to this Court that the ALJ carefully considered the medical evidence in the record in its totality in deciding to discount Grisham's treating physician, and the record contains sufficient evidence for the ALJ to make his decision.

**B.     The VE's testimony regarding the jobs that the claimant can perform do not conflict with the DOT.**

Grisham argues that the "Commissioner's decision should be reversed because the jobs the [VE] testified the claimant can perform conflicts with the [DOT]." *See* Doc. 13 at 11.   The VE testified that Grisham could perform jobs such as a call out operator, counter clerk, and surveillance system monitor.   Tr. 34, 72.   Grisham asserts that the "very short and simple instructions" designation made by the ALJ would result in a General Education Development ("GED") reasoning level of one under the DOT.   *See* Doc. 13 at 13.   On the other hand, the jobs that the VE testified Grisham could perform range from a reasoning level of two to three.[12]   *Id.*   Grisham argues that the ALJ failed to resolve this inconsistency, and that she is not able to perform the jobs identified by the VE.   *See* Doc 13 at 14.

The court in *Leonard v. Astrue* provided a helpful outline of SSR 00-4p in relation to a conflict between a VE's testimony and the DOT:

> In SSR 00-4p, the [SSA] recognized that the VE's testimony should generally be consistent with the information contained in the *DOT*.   *See* SSR 00-4p.   Accordingly, when an apparent conflict between the two arises, the SSR directs that the ALJ "must elicit a reasonable explanation for the conflict before relying on the VE['s testimony]."   *Id.*   Moreover, the ALJ is obligated to inquire on the record as to whether there are any inconsistencies between a VE's testimony and the *DOT*.   *See id.*   In addition, before the ALJ can rely on the VE's testimony as substantial evidence for his or her determination, he or she must resolve any conflict between the VE's testimony and the *DOT*.   *See id.*   SSR 00-4p provides that "[t]he adjudicator will explain in the determination or decision how he or she resolved the apparent conflict."   *Id.*   It also indicates that "[t]he adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified."   *Id.*

---

[12] Grisham focuses more on the positions of call out operator and surveillance system monitor because they require a reasoning level of three, while counter clerk only requires a reasoning level of two.

487 F. Supp. 2d 1333, 1338-39 (M.D. Fla. 2007), *aff'd Leonard v. Comm'r of Soc. Sec.*, 409 F. App'x 298 (11th Cir. 2011).

However, it has been found that "[e]ven assuming that an inconsistency existed between the testimony of the vocational expert and the DOT, the ALJ did not err when, without first resolving the alleged conflict, he relied on the testimony of the vocational expert." *Miller v. Comm'r of Soc. Sec.*, 246 F. App'x 660, 662 (11th Cir. 2007); *see also Wilds v. Comm'r of Soc. Sec.*, 322 F. App'x 800, 801 (11th Cir. 2009) (holding that if a conflict had existed, the administrative law judge would have been entitled to rely on the testimony of the vocational expert). The Eleventh Circuit adopted the Sixth Circuit's view and held that the "VE's testimony 'trumps' the DOT." *Jones*, 190 F.3d at 1230 (11th Cir. 1999). Although the *Jones* ruling was issued prior to the promulgation of SSR 00-4p, this Court has found that the "promulgation of SSR 00-4p does not [ ] undo the rule in *Jones* nor does the ruling by its own wording, mandate that an ALJ has a duty to independently investigate whether there is a conflict between the VE's testimony and the DOT." *Campbell v. Astrue*, 2010 WL 3362230, *7 (M.D. Ala. 2010) (quoting *Garskof v. Astrue,* 2008 WL 4405050, *5 (M.D. Fla. 2008). The reason SSR 00-4p does not undo the rule in *Jones* is because an "agency's ruling does not bind this court." *B. B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981).[13]

Here, the ALJ clearly requested that the VE testify whether his testimony

---

[13] A decision of the Unit B panel of the Former Fifth Circuit is regarded an as binding precedent which should be followed absent Eleventh Circuit en banc consideration. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

"materially differs from the information set forth in the [DOT]." Tr. 70. To which the VE responded "Yes, Your Honor." *Id.* The ALJ even provided Grisham's counsel with the option to question the VE which would have been an opportune time to raise the issue of such a conflict to the ALJ's attention; however, no questions related to this issue were asked. Tr. 75-77. Accordingly, the Court finds that the ALJ properly inquired as to whether there was a conflict between the VE's testimony and the DOT, and was under no further duty to independently investigate the issue without more.

## VII. CONCLUSION

Pursuant to the findings and conclusions detailed in this Memorandum Opinion, the Court concludes that the ALJ's non-disability determination is supported by substantial evidence and proper application of the law. It is, therefore, **ORDERED** that the decision of the Commissioner is **AFFIRMED.** A separate judgment is entered herewith.

DONE this 27th day of December, 2013.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE